THE UNITED DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

FACEL CASTA,

  **Plaintiff,**

  **v.,**

CITI INTERNATIONAL FINANCIAL
SERVICES, LLC; INSURANCE
COMPANIES "A" and "B,"

  **Defendants.**

CIVIL NO.

**JURY TRIAL IS DEMANDED**

# COMPLAINT

**TO THE HONORABLE COURT:**

  **COMES NOW** the plaintiff, **FACEL CASTA** by and through the undersigned counsels, Jose F. Quetglas and Pedro R. Vazquez, and respectfully alleges, states and requests, as follows:

## I.  INTRODUCTION

  1.1 The plaintiff, **FACEL CASTA** ("**Casta**" or "Plaintiff"), brings this action against her former employer, **CITI INTERNATIONAL FINANCIAL SERVICES** ("**CIFS**" or "Defendant"), pursuant to this Court's diversity jurisdiction, for sex discrimination and sexual harassment, retaliation, violation of the provisions of the State Insurance Fund ("SIF") intentional infliction of emotional distress and wrongful dismissal. **Casta** seeks compensatory relief and damages as a result of abusive treatment.

  1.2 Additionally, **Casta** brings this action against **CIFS** pursuant to this Court's Federal Question jurisdiction for violation of the Family Medical Leave Act (FMLA).

## II.  JURISDICTION & VENUE

2.1     This Honorable Court has jurisdiction over the parties and the subject matter of this litigation pursuant to 28 U.S.C. § 1332, where all the parties on either part of the controversy are of diverse citizenship and the matter in controversy exceeds the sum of Seventy Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

2.2     The facts set forth in this complaint are actionable under Law No. 17 of April 22, 1988 (P.R. Laws Ann. tit. 29, § 155 *et. seq.*; henceforth "Act 17"), Law No. 100 of June 30, 1959 (P.R. Laws Ann. tit. 29, § 146 *et. seq.*; henceforth "Act 100"), Law No. 69 of July 6, 1985 (P.R. Laws Ann. tit. 29, § 1321 *et. seq.*; henceforth "Act 69"); Article 5A of Law No. 45 of April 18, 1935 (P.R. Laws Ann. tit 11; § 7; henceforth "Act 45"); Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194 *et seq.*; henceforth "Act 115"); Law No. 80 of May 30, 1976 (P.R. Laws Ann. tit. 29, § 185a *et seq.*; henceforth "Act 80"); and, Articles 1802 and 1803 of the Puerto Rico Civil Code (31 L.P.R.A. §§ 5141 and 5142; henceforth referred to as "Articles 1802 and 1803").

2.3     This Honorable Court also has subject matter jurisdiction to allow this suit pursuant to 28 U.S.C. § 1331.  This action is authorized pursuant to the Family Medical Leave Act (29 U.S.C.§ § 2601-2654, *et. seq.*; "FMLA").

2.4     Venue is proper in the instant case in that all of the events giving rise to this claim occurred in the Commonwealth of Puerto Rico.

2.5     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff demands a trial by jury in the instant case.  Fed. R. Civ. P. 38b.

## III.  PARTIES TO THE ACTION

3.1     **Casta** is an adult female individual, a *bona fide* resident of the State of Florida and a citizen of the United States of America.

3.2    **Casta** posses a Master's Degree in Finance and a Doctoral Candidate in Business Administration. She has been a visiting professor at the Wharton School Business, of the University of Pennsylvania. Plaintiff is fluent in five languages (English, Spanish, French, Portuguese and Italian). She has published scholarly articles in peered review journals. She has registered several patents in the U.S. Patent Office.

3.3    At all times relevant herein, **Casta** fulfilled duties for **CIFS** as Relationship Management Associate ("RMA"), at its offices located in Parque Las Américas I, Hato Rey, Puerto Rico (hereinafter referred to as "the PR Office"). Plaintiff duties consisted of opening accounts, submitting "Affidavit W8", working with account maintenance, and answering calls to execute customer orders.

3.4    At all times relevant herein, **Casta** was duly qualified to carry out the duties assigned to her in the position Relationship Management Associate; she performed her functions with a high degree of excellence, diligence and interest in her work; and, she expected to be treated in a professional and respectful manner by her supervisors and co-employees, without the fear of being the object of discrimination, harassment and retaliation, or of being subjected to hostile and abusive conduct by reason of her sex.

3.5    At all times relevant herein, **CIFS** was an entity duly incorporated, organized and existing under the laws of the Commonwealth of Puerto Rico, which had its principal place of business located in therein, and was authorized to conduct, as it conducted, financial services in the island.

3.6    **CIFS** is a part of **Citigroup**, one of the largest financial institutions in the world. **CIFS** provides clients with access to premier financial products and services with an international perspective and global reach.  Through personal and discreet client-investor relationships, Defendant offers access to global markets, a wealth of independent market research and the strategic support of Wealth Management Solutions. Ranging from the

foundation-building investments to the more sophisticated, Defendant's Financial Professionals/Wealth Managers provide clients with the customized tools to help them assess their financial objectives, access relevant product and market information through the ease of its online brokerage tools and the assistance to develop a personal investment strategy that suits their needs.

3.7     At all times relevant herein, **Marcelle Diaz** ("**Diaz**") was an adult female agent and employee of **CIFS**, acting within the course and scope of such agency and employment, who performed managerial, administrative and/or supervisory functions and duties for Defendant, as Remote Unit Sales Manager, at the PR Office; and, as such, she was CASTA's first line supervisor throughout her employment tenure.

3.8     At all relevant times during, **Homar Mauras** ("**Mauras**") was an adult male agent and employee of **CIFS**, acting within the course and scope of such agency and employment, who performed managerial, administrative and/or supervisory functions and duties for Defendant, as Chief Financial Officer ("CFO"), at the PR Office.

3.9     At all relevant times during, **Michelle Cintrón** ("**Cintron**") was an adult female, the spouse of **Mauras** and an agent and employee of **CIFS**, acting within the course and scope of such agency and employment, who performed functions and duties for Defendant, as Trader, at the PR Office.

3.10    At all times relevant herein, **INSURANCE COMPANIES "A"** and **"B"**, which are designated with fictitious names because their true names are unknown to Plaintiff at this time**,** were insurance companies duly organized under the laws of States other than the State of Florida, had their principal place of business located in such other States, and were authorized to engage, as they did, in the insurance business in Puerto Rico.

3.11    At all times relevant herein, **INSURANCE COMPANIES "A"** and **"B"** had issued and had in full force and effect insurance policies, which provided coverage for the civil liability of **CIFS** for damages in a claim such as the one set forth in this complaint.

### IV.  TOLLING OF THE STATUTE OF LIMITATIONS

4.1.    The facts that give rise to this claim comprise a pattern of unlawful conduct pursued by Defendant's agents and employees against Plaintiff. All acts of misconduct allaged herein were united by similarity, repetition and continuity, forming a single pattern of behavior, where the earliest act took place in in January 2015 and the last act occurred on March 31, 2016, the date on which Defendant unjustifiably and illegally dismissed Plaintiff from her employment.

4.2    Plaintiff tolled the applicable statutes of limitations by filing a judicial claim on December 29, 2016, with the Puerto Rico Superior Court. This claim was dismissed without prejudice by Judgment issued on May 3, 2017, and served on May 15, 2017.

### V.  FACTS COMMON TO ALL CAUSES OF ACTION

5.1    On January 22, 2015, **Casta** started her employment with **CIFS** in the Mass-Affluent Division, as RMA, with a work-schedule from 8:30 a.m., to 5:30 p.m., five days a week, and under the immediate supervision of **Diaz**. She was discharged from her employment on March 31, 2016.

5.2    During the course of her employment with **CIFS**, **Casta** assisted **CIFS** Broker **Felipe Alvares ("Alvares"**) in the handling of his Brazil Mass Affluent account, as well as other Mass Affluent Brokers with their respective accounts.

5.3    Upon the commencement of **Casta's** employment, **CIFS** should have given her formal training for the performance of the functions and duties of her position of RMA, but it failed to do so. Instead, for several months, Plaintiff had to acquire the level of knowledge and skill required by her position through "on the job training." **Diaz** would assign

5

tasks to Plaintiff and she had to resort to ask work colleagues for help when faced with questions and uncertainties, since she was working in an industry heavily regulated by the Financial Industry Regulatory Authority (FINRA).

5.4    Likewise upon the beginning of **Casta's** employment, **CIFS** should have furnished to her the material to prepare for the Series-7 examination, since **CIFS** required certain employees, Plaintiff among them, to pass such examination. Each time **Casta** asked her supervisor **Diaz** when was **CIFS** going to deliver the materials to her so that she could start studying for the Series-7 examination, **Diaz** would respond that the request for her study materials was on top of Moises Valladares' (Chief of Compliance) desk and that, whenever he felt like it, he would deal with that matter and sign the authorization. **CIFS** did not deliver these materials to Plaintiff until April 27, 2015; that is, over three months late.

5.5    Within days of **Casta's** arrival at **CIFS'** PR Office, and still in January 2015, Defendant's agents and employees openly referred to Plaintiff as: "Mary" or "Mary from the neighborhood" ("María la del barrio," in Spanish), in reference to a folkloric personality of a woman who slept her way to the top, which caused her to feel embarrassed and humiliated. So widespread were these remarks in the Office that even **Mauras** (CEO) asked **Casta**: "Maria, has your boyfriend gotten used to your arrival at home late?" **Casta** objected to this comment and **Mauro** responded: "Mouthy isn't she?"

5.6    During the first three weeks at work, from early in the morning until late in the afternoon, many of **CIFS'** male agents and employees, who worked on the PR Office's floor, would wink at **Casta**.

5.7    Frequently, **Mauras** would incisively and lustfully stare at **Casta's** bust, legs and buttocks. Moreover, sometimes, when **Casta** spoke with any male colleague, **Mauras** would look fixedly at him and the colleague that Plaintiff was talking to would stop talking to her and had to leave.

6

5.8     Commencing in January 2015, and up to March 2016, **Cintron** subjected **Casta** to a pattern of same-sex hostile work environment harassment, motivated by jealousy over the interest that her husband, **Maura**, had in Plaintiff. **Cintron** openly engaged in threatening and intimidating conduct towards **Casta** and, on several times, invaded her physical integrity. For example, on occasions when **Cintron** saw **Casta** entering into the bathroom, **Cintron** would follow her inside, would make eye contact with her, and then would stare down at her with hostility. On multiple occasions, **Cintron** also repeated this conduct upon adjourning for the day. As **Casta** was on her way out the office for the day, **Cintron** would purposely catch-up to her and make a point to stare down at her in a hostile way. On other occasions, **Cintron** would walk by where **Casta** was seated or standing and would purposefully thrust her breast against Plaintiff's face or body.

5.9     **Diaz** (Plaintiff's immediate supervisor), **Mauras** (CEO) and various other **CIFS'** Brokers and co-workers, intentionally and actively, participated in hostile, retaliatory, abusive, extreme and outrageous conduct that inflicted emotional distress upon **CASTA** and which is also object of this Complaint. **Maura** and **Diaz** knowingly allowed this unlawful behavior to occur and to continue unabated, without taking any action to stop or prevent it.

5.10    In February 2015, **Diaz** and **Mauras** allowed **CIFS** Broker **Vladimir Reyna** ("**Reyna**") to preside over a meeting of the Mass-Affluent Staff. During same, **Reyna** assumed a demeaning tone towards **Casta**. **Reyna** complained that the clients in the Brazilian Portfolio assigned to **Casta** required less time, given their sophistication, than the clients in the Colombian Portfolio, who were less educated and demanded more time; notwithstanding that **Reyna** had two RMAs assigned to him. **Reyna** went on to berate and belittle Plaintiff, who had barely been training at **CIFS** for one month, alleging that the purported inefficiency of having an RMA like her, without a brokerage license, in the PR Office was causing him to be overworked and detrimentally affected his goals and commissions. One of **Reyna's** RMA,

**Luis Salgado,** made similar remarks; and he also blamed **Casta** for the overwork. **CIFS** Broker **Lorena Torres** ("**Torres**") then singled **Casta** out, requesting her to give an explanation regarding **Reyna's** complaints. **Casta** felt great shame and humiliation in this unjustified confrontation; more so, because the conference room had glass panels and other employees working nearby on the office floor, outside the conference room, could hear the discussion.

5.11    The following day, another staff meeting was conducted, where **Reyna** engaged in a tirade towards **Casta** and, in a physically confrontational demeanor, accosted her, uttering: "What? Do you have any problem? Is something the matter with you?" Given **Reyna's** intimidating behavior during this staff meeting, **Casta** left the conference room, went to **Maura's** office and complained of **Reyna's** misconduct to him. **Mauras** responded that **Reyna** was simply jealous of **Casta's** qualifications, given her fluency in Portuguese, because **Reyna** supposedly knew that should the PR Office have any turnovers from the Brazil Portfolio Branch, Plaintiff was better situated to take over such duties than any other employee at the PR Office. Indeed, **Maura** told **Casta** that, instead of hiring a Financial Advisor from Brazil, he would promote her to the position of Financial Advisor because she was a full Portuguese speaker; this way, the company did not have to afford visas and incur in moving expenses to hire a Financial Advisor from Brazil. Finally, **Mauras** then thanked **Casta** for bringing this matter to him and not getting Defendant's Human Resources Department ("HR") involved in the same.

5.12    For several months after **Casta** complained of **Reyna's** misconduct to **Mauras**, **Reyna** made it a point to let her know of the arsenal of weapons that he owned. **Casta** felt intimidated and feared for her safety and life, as the hostile environment in **CIFS** kept deteriorating her mental health.

5.13    May 1, 2015, was Labor Day in all of Latin America. For this reason, **CIFS'** branches were closed, customers were on vacation and no calls were being received at the PR Office. During a legally entitled break, **Casta** and two other employees momentarily stepped out the office to buy coffee at Starbucks. Upon their return, **Diaz** verbally reprimanded **Casta** for such action, but not the other two employees; and she forewarned **Casta** that, once she began her shift, she could not leave the office until departure time.

5.14    On or about May 20, 2015, an external consultant arrived at the PR Office for a presentation to the Mass Affluent Staff, the team to which **Casta** belonged. Management introduced the external consultant to the whole Mass Affluent Staff, except **Casta.** Plaintiff was also the only one excluded from participating in the meeting. **Casta** felt isolated and humiliated.

5.15    That same day, as result of the continuous harassment and mobbing that **CASTA** was being subjected to at the workplace, she felt emotionally ill and she requested sick leave from her supervisor, **Diaz**. Shortly thereafter, **Casta** told **Torres** that she was leaving because she was feeling ill and to let her know by e-mail if anything was needed from her so that she could do it from her home. **Torres** then questioned the legitimacy of Plaintiff's illness, implying malingering.

5.16    On the following day (May 21), **Casta** opened a May 20 e-mail that **Torres**, at the behest of **Mauras**, sent to her after she left on sick leave the previous day, requesting information to gauge her productivity because **Torres** had been unable to do so given that she had left for the day. This act formed part of a pattern of excessive supervision that then began towards Plaintiff.

5.17    In late May 2015, **CIFS** announced that **Mirella Pessano**, a Brazilian staff member, who assisted in the handling of the Mass Affluent Brazil Portfolio, would be

9

departing the PR Office. After the announcement, per **Mauras'** instructions, the phone calls from Brazil clients to **Pessano's** desk began to be re-routed to **Casta's** telephone.

5.18   When the first phone calls from Brazil clients were re-routed to Plaintiff's telephone that same day, everyone on the floor was left staring at each other and the office went into an eerie silence, as Plaintiff spoke Portuguese during the phone exchanges. Shortly thereafter, **Mauras** left his office and went to Plaintiff's work area to ensure that these international calls were routed to her.

5.19   Resentment and hostility towards **Casta** by other employees ensued, since they assumed that Plaintiff, who was the newest RMA, would inherit the functions vacated by the departing **Pessano**, given that Plaintiff was the only one left in the PR Office that read, wrote and spoke fluently Portuguese. Besides, **Casta** was a U.S., citizen and it would save **CIFS** significant cost and logistical entanglements not having to expatriate another Brazilian.

5.20   On or about May 30, 2015, **CIFS** held a farewell party for the departing **Pessano**. That day, the other personnel's resentment and hostility towards **Casta** intensified. Other staff members delivered hard stares and uttered brazen comments to Plaintiff. Co-worker **Verónica Ospina** ("**Ospina**"), in the presence of Plaintiff, told **Pessano**: "**Mirella** as of Monday, I start to answer your calls." **Ospina,** thereafter, took it upon herself to be the sole custodian of the keys of the desk drawers of **Pessano**. From then on, every time **Ospina** passed by Plaintiff's desk she would crash into Plaintiff's chair, when she had enough space in the corridor to avoid making any contact.

5.21   During an exchange between **Casta** and **Alvares** -- the Financial Advisor of the Mass Affluent Brazil Portfolio -- that took place on June 1, 2015, in an aggressive and hostile tone, he told Plaintiff to go to work with **CIFS** Broker **Fernanda Valongo** ("**Valongo**"), as follows: "Go to hell to work with her so you can see what a daughter of a

great bitch she is;" "She looks for her assistants in Fogo de Chão" (a Brazilian restaurant in San Juan).

5.22    On or about June 4, 2015, **Casta** advised **Diaz** (her first line supervisor) that her work had dried up and requested further assignments. **Diaz** instructed her to ask the other staff members for work. When Plaintiff did so, the other personnel snidely responded that they did not have work for her. Notably, that day, the phone calls from Brazil stopped coming into Plaintiff's phone, notwithstanding that **Mauras** had ordered that she field these calls. **Diaz's** intent was clear: to leave Plaintiff idling, essentially divesting her of duties and functions.

5.23    Later on that same June 4, **Casta** reported to **Diaz** that the other staff members did not have work for her. Plaintiff also complained to **Diaz** about the foregoing idling. **Diaz** then instructed **Casta** to start preparing for the Series-7 examination. From then on, Plaintiff had to go to work only to train for the Series-7 examination because was not receiving any letters of operations, e-mails or phone calls; and, even sometimes, she was unable to access data in **CIFS'** computer systems.

5.24    On or about June 5, 2015, **Casta** complained to **Diaz** about the hostile work environment that she had been subjected to at all times. **Diaz** then advised Plaintiff that she would address the matter expeditiously given the she was complaining of hostile work environment. Notwithstanding, **Diaz** failed to take any action to stop or prevent the hostile work environment, which intensified in frequency and severity.

5.25    Once **Casta** complained to **Diaz** about the hostile work environment, **CIFS** set in motion a policy of open hostility, abusive behavior, humiliation and offensive conduct towards her. By design, **CIFS**, through its agents and employees, implemented a process of isolation and alienation. **Casta** was placed in abject conditions. The foregoing behavior of

11

Defendant was in retaliation for Plaintiff having complained of harassment and mobbing to **Diaz**.

5.26   Once **Casta** complained to **Diaz** about the hostile work environment, **CIFS** completely isolated Plaintiff. Defendant's agents and employees made it very clear to Plaintiff that they did not want her there. They would not speak to or look at her, unless it was strictly necessary or to harass and bother her. Each time **Casta** sat at a table to eat in the dining room during lunch breaks, her co-workers would get up and leave, reason for which Plaintiff opted for going to her car and eating her lunch there alone. **CIFS'** staff members' misconduct was so brazen that they began to ask Plaintiff when she was going to resign to her employment.

5.27   On or about June 8, 2015, **CIFS** celebrated **Diaz's** birthday at the PR Office. When **Casta** entered to the activity, she was received with about faces. In the activity no one spoke to or looked at her. Wherever she sat down, people would move in order to not be near her; no one wanted to sit next to her. Plaintiff opted to leave the birthday activity.

5.28   On that same day (June 8), given that **Casta** had been requesting work assignments, **Valongo** called Plaintiff to her desk to delegate some work to her. When **Casta** arrived, **Valongo** ordered her to dispose of some papers in the trashcan.

5.29   Even thou **Casta** complained to **Diaz** about the hostile work environment, **Cintron** continued to walk by her desk to intentionally thrust her breast against Plaintiff's face or body. Displaying a similar behavior, **Diaz** went by **Casta's** work area and shoved her gluteus on Plaintiff's face. Additionally, **Ospina** continued to pass by Plaintiff's desk getting uncomfortably close to her chair.

5.30   **Ospina's** conduct became markedly offensive and salacious once **Casta** complained of her behavior to **Diaz**. Sometimes **Casta** would go to her desk and find **Ospina** sitting on her chair or reclining on it; **Ospina** would then look at Plaintiff with hostility and get upset when Plaintiff asked her to leave her work area and to please respect her own space

12

there. Moreover, when **Casta** conversed with male co-workers, **Ospina** would barge into the conversation and hug, kiss and caress said male employees in a sexually suggestive manner. Indeed, **Ospina** went as far telling one male employee that she could "pull [his] pylon good;" a sexually charged comment. **Ospina** also then got into the habit of sitting across **Casta,** spreading her legs and showing her crotch to Plaintiff.

5.31   On several occasions, **CIFS** Broker **Alvares** told **Casta** that she was an idiot; and, he used pejorative language and displayed hostile gestures and attitudes towards her.

5.32   On or about June 17, 2015, **Casta** received an unusually high amount of phone calls at her desk that were meant for other staff members, which she then had to transfer to the employees to whom the calls were made. This was an anomaly in light of the fact that, once she complained of harassment and mobbing to her supervisor, Plaintiff stopped receiving phone calls from Brazilian clients, which were the ones she was supposed to handle, and was left idling. It was evident, that these phone calls to other employees were being routed to Plaintiff in order to unduly monitor and harass her.

5.33   Earlier that month, by e-mail of June 4, 2015, **Diaz** requested **Casta** to provide her input about her performance goal expectations for the mid-term evaluation. However, at no time previously did **Diaz** have a sit-down with **Casta** to provide her a career plan, explain what her major functions would be or which were her production requirements. Put simply, Plaintiff had no idea what were the Defendant's expectations for her. When **Casta** requested guidance from **Diaz** regarding her goals for the mid-term evaluation, **Diaz** refused to provide any except to say: "you need to find the way to an amicable environment."

5.34   When the mid-year evaluation day arrived on or about July 15, 2015, **Diaz** met with **Casta** for the face-to face discussion of her work performance. During the meeting, **Diaz**, among other things, told Plaintiff that **Alvares** had complained that she resisted his feedbacks and instructions. **Casta** replied that she had no resistance either to **Alvares'** or any

13

other Broker's feedbacks and guidance. **Casta,** again, complained to **Diaz** about the abusive and hostile environment she was being subjected to at work by the Brokers and other RMAs. When Plaintiff complained that, on many occasions, **Alvares** shouted at her and called her an idiot, notwithstanding her pleas to him to address her in a low voice, **Diaz** told her: "I could talk to you like that too".

5.35 The foregoing events on evaluation day, in conjunction with the cumulative effect of the continuous mobbing, harassment and rigorous terms and conditions of employment that **Casta** was subjected to at the workplace, caused her to suffer a nervous breakdown that led her to seek out medical treatment and, after psychiatric evaluation was partially hospitalized in Panamerican Hospital from July 14 to 22, 2015. **Casta** recovered sufficiently to obtain clearance by her psychiatrist to return to work with residual mental limitations and while she continued under psychiatric treatment.

5.36 Upon **Casta's** return to work from the medical leave on or about July 24, 2015, **Diaz** summoned Plaintiff to her office and admonished her because she was wearing a sleeveless blouse in purported contravention of the Dress Code. **Casta** complained that there were other female employees similarly dressed on the office floor and she was the only one adminished for the Dress Code. **Diaz** retorted that she did not have to give her any explanations about the way she supervised her employees. She then sent Plaintiff back to her work area. Shortly therafter, **Diaz** circulated a communication among the employees about Defendant's Dress Code. Thereafter, HR sent an email to Plaintiff on the Dress Code. This drill where **Diaz** would single out and admonish **Casta** and then send a memo on the conduct in question to all employees under her supervision, followed by e-mail directly to Plaintiff from HR, became part of a pattern and practice of retaliatory behavior against Plaintiff for having complained of prohibited personnel practices.

14

5.37    In late July 2015, **CIFS** Broker **Fernando Campo** was transferred to the **CIFS** Miami Office and **CIFS** Broker **Kennett Rivera** ("**Rivera**") was put in charge of transfering funds from accounts in the Miami Office to accounts in the PR Office. Defendant assigned **Casta** to assist **Rivera** with the handling of his accounts during this transfer period. In this way, after close to two months without work and idling, Plaintiff was reinstated to the duties of her post of RMA.

5.38    On or about July 31, 2015, **Alvares** advised **Diaz** that **Casta** had supposedly failed to open required accounts during the previous four days. **Diaz** then barged towards **Casta's** work area, stood by her cubicle and, visibly upset and screaming, berated Plaintiff for **Alvares'** allegations about the accounts, in the presence of the trading agents. **Casta** explained to **Diaz** that the responsibility of opening these accounts was under the purview of the **CIFS** Tampa Office and that she did not have authorization to open them.

5.39    Later on that day, **Casta** complained to **Diaz** about the way **Alvares** mistreated her and how he had yelled at her all over the office floor regarding the accounts. **Casta** also told **Diaz** that she felt very embarrassed and humiliated by the reprimands and scoldings that both she and **Alvarez** were making her endure in the presence of other employees.

5.40    On that same day (July 31, 2015), **Casta** complained to the HR Chief, **Suzzette Ramirez** ("**Ramirez**"), about the abusive and hostile treatment that she had been subjected to at the workplace over the last several months.

5.41    Upon **Casta** raising the issue with HR, **Diaz** proceeded to her work area and, in the presence of other employees, ordered Plaintiff to her office for a telephone conference with **Ramirez**. Once at the office, since the unscheduled conference had taken Plaintiff by surprise, she requested arbitration or mediation regarding the matter. Without hearing the merits of any claim, **Ramirez** -- who was listening on the phone line -- accused Plaintiff of having attitude problems and of an inability to adapt to the **CIFS** culture. **Casta** objected to

15

such asseveration and questioned the manner in which the conference was being conducted, in light of the complaint that she had just presented to HR. In a blatant act of unbridled retaliation, **Diaz** accused **Casta** of insubordination and threatened her with a written reprimand.

5.42    During the aforementioned telephone conference, **Ramirez** admonished **Casta** for going to the bathroom instead of rushing to **Diaz**'s office immediately after she had been summoned there. **Casta** told **Ramirez** that she had felt very embarrassed and anxious when **Diaz** ordered her to the office in front of the other employees; and, that she had first gone to the bathroom to compose herself. Plaintiff explained to the HR Chief that **Diaz's** pattern and practice of behavior was to chastise and humiliate her in front of her colleagues, sometimes for inconsequential and trivial things, such as the color of her slacks. At the end of the telephone conference, **Ramirez** said that she would meet with Plaintiff with relation to her complaints.

5.43    On or about August 3, 2015, **Ramirez** summoned **Casta** to her office and told her that she would mediate the controversy, pursuant to FINRA's regulations regarding conflicts between employees and/or customers and registered agents.

5.44    During the August 3 interview, **Casta** complained to **Ramirez** about the pattern of harassment and mobbing that she had been subjected to at the workplace. Plaintiff further complained that **Diaz** had fostered the hostile work environment, since **Diaz's** open mistreatment of her had encouraged other employees to harass and bother her. Also, **Casta** told **Ramirez** that she could not work with **Alvares** because he constantly called her an idiot, yelled at her and induced her to error in the performance of her duties. Plaintiff explained to **Ramirez** that she had not complained earlier attempting to not further escalate the hostile work environment, given the reprisals for her prior complaints to **Diaz**. Plaintiff requested the

HR Chief, as a remedy, to be reassigned to a different Supervisor and another Broker, given the pattern of abusive and hostile conduct pursued by **Diaz** and **Alvares** towards her.

5.45    Shortly after **Casta** complained of the hostile work environment to **Ramirez**, **Diaz** passed by Plaintiff's cubicle and said to her in a menacing manner: "I feel like punching you."

5.46    Notwithstanding **Casta's** complaints to **Ramirez**, **CIFS** failed to take any corrective action or remedial measure and the hostile work environment continued unabated with the same frequency, persistence and severity as before. Moreover, Defendant took retaliatory measures against Plaintiff for having complained of harassment and mobbing to HR.

5.47    After **Casta's** grievance to **Ramirez**, some times when Plaintiff arrived to her desk in the mornings, she would find her drawers open and her things rummaged; on occasions, when she momentarily left her work area and returned to her desk, she would discover that her purse had been opened and searched; and, when she printed work-related documents and walked to the printer to retrieve them, she would find that the documents had disappeared.

5.48    On or about September 14, 2015, **Diaz** admonished **Casta** regarding unopened accounts assigned to **Alvares**, purportedly for something Plaintiff failed to execute. **Diaz** also belittled and ridiculed Plaintiff in the presence of other employees. **Diaz** told Plaintiff that she needed a course on account opening and brought in **Jennifer Montalvo**, another RMA, to "spoon-feed" account opening procedure to **Casta,** while the other employees laughed at her. **Casta** then proceeded with a dry-run of the account opening procedure on her own in the presence of **Montalvo**, who acknowledged that Plaintiff had correctly executed the procedure and so apprised **Diaz**.

5.49    Upon information and belief, **CIFS** began to selectively strictly enforce its time schedule policy upon **Casta.**

5.50    **Diaz** strictly monitored **Casta's** entry time. For example, on or about October 12, 2015, Plaintiff arrived at the office at accorded time (8:30 a.m.). However, she went to the restroom after she checked in and sat in her cubicle to work at 8:45 a.m. Thereafter, **Diaz** docked 15 minutes of her pay. Likewise, the following week, **Casta** arrived at the office at 8:30 a.m., checked in, went to the bathroom and started her workday at 8:40 a.m.; **Diaz** later reduced 10 minutes of her pay.

5.51    When **Casta** questioned **Diaz** for scrutinizing her time sheets and deducting tie from her pay, the latter responded, "We are not friends, we don't go out drinking and we don't drink coffee together at Starbucks, so you have to respect my determinations." Plaintiff responded that she would deal with the hours as she said and would accept the dock in pay. She then left to her work area. Notwithstanding, **Diaz** wrote down a memo for insubordination to Plaintiff that was placed in her file in HR.

5.52    **CIFS** did not strictly enforce its time schedule policy upon other RMAs and employees similarly situated to Plaintiff, nor upon the rest of the personnel, many of whom arrive at the office after entry time, or, arrived in time, checked in and began their work day from 15 to 60 minutes later.

5.53    On or about December 23, 2015, **Ramirez** summoned **Casta** to her office for a meeting with her and **Diaz**. Once there, **Casta** was given a disciplinary memorandum for 45 purported instances of tardiness since June 2015. Notably, the point in time when the tardiness problem supposedly began coincided with the date (June 5, 2015) that **Casta** had complained to **Diaz** about the hostile work environment. Moreover, the instances of tardiness, on the average, ranged from 5 to 10 minutes; and, many were due to the somnolence and

additional similar side effects in the mornings caused by the prescribed medications Plaintiff was taking for her emotional condition.

5.54   The issuance of the foregoing disciplinary memorandum was unjustified and constituted an act of discrimination and retaliation, which caused **Casta** to suffer extreme anxiety and exacerbated the stress she was undergoing as result of the cumulative effect of the continuous mobbing, harassment, retaliation and rigorous terms and conditions of employment that she was subjected to at the workplace, to the point where she suffered another nervous breakdown that led her to seek out medical treatment through the SIF's program on that same day (December 23, 2015). By January 2016, Plaintiff had recovered enough from her mental condition to be able to work and the SIF's physicians cleared her to go back to work in January 2016, with residual limitations and while she continued under psychiatric treatment.

5.55    Shortly after Plaintiff resumed work activity at the Office, **Diaz** issued a memorandum to her captioned "Final Warning," advising that if she did not approve the Series-7 examination she would be terminated. Upon information and belief, other employees had been allowed to remain employed with **CIFS** without obtaining the Series-7 certification. Regardless, in view of Plaintiff's fragile mental health at the time, the issuance of this Final Warning by **Diaz** constituted a blatant act of retaliation motivated by Plaintiff's complaint of hostile work environment to HR, her use of legally protected benefits -- namely, the SIF's program -- and her request for leave under the FMLA.

5.56    During that same January 2016 meeting, **Diaz** proceeded to discuss with **Casta** her annual work performance evaluation.

5.57    On or about January 27, 2016, **Diaz** requested from **CASTA** an explanation as to why she continued receiving psychiatric treatment under the SIF's program.

19

5.58   In early February 2016, **Diaz** attempted to blame **Casta** for alleged errors in the opening of an account, when that account had not been handled by her and had been executed while she was on sick leave.

5.59   On February 7, 2016, **CIFS** Principal **Teresa Fernandez** slipped and almost fell on the floor. **Reynaldo Polanco**, Chief Operation Officer, witnessed the incident and commented, in a loud voice and looking at Plaintiff's, to **Fernandez**: "Do not fall because later you go to the [SIF] and come back with a disability." Evidently, Defendant had unlawfully disclosed to its agents and employees confidential and protected information regarding her medical treatment through the SIF's program.

5.60   **Casta's** mental health continued to deteriorate as result of the ongoing mobbing, harassment, retaliation and rigorous terms and conditions of employment that she was subjected to at the workplace, until she suffered a relapse of her emotional condition by mid-February 2016 and had to leave work to receive psychiatric treatment through the SIF's program. Subsequently, she recuperated sufficiently to obtain clearance from the SIF's psychiatrists to return to work on March 30, 2016, with residual emotional limitations and while she continued under psychiatric treatment.

5.61   Upon returning to work from her sick leave on March 30, 2016, **Casta** was greeted by her co-workers with sarcasm regarding her sick leave under the SIF program, with undertones of malingering. **Ramirez** (Chief of HR) was the only employee who was privy to Plaintiff's medical treatment through the SIF. Once again, **CIFS** had unlawfully disclosed to its personnel Plaintiff's confidential and protected medical information concerning her treatment psychiatric treatment through the SIF's program.

5.62   That day (March 30), **CIFS** did not allow **Casta** to carry out her essential work duties; and there was no assignment of tasks, even though he requested the same.

5.63    On March 31, 2016, upon arriving at work in the morning, **Casta** was summoned to HR, where **Ramirez** handed her a termination letter, which was devoid of any reason or justification for such dismissal.

5.64    The frequency, continuity and intensity of the pattern of harassment, mobbing and retaliation to which **Casta** was subjected to by **CIFS**, unreasonably interfered with her work performance and created an intimidating, hostile, abusive and offensive working environment, causing her to feel offended, humiliated, uncomfortable, bothered, anxious, depressed, afraid, angry, intimidated, stressful and under pressure in her employment. Plaintiff performed the duties assigned to her in her employment by making an extraordinary effort so that the quality of her job would not be affected.

5.65    At all times relevant herein, **CIFS** was fully aware of the pattern of harassment, mobbing and retaliation to which **Casta** was subjected in the workplace, and Defendant failed to take any action or measure to prevent or stop it. Instead, Defendant knowingly allowed such misconduct to occur and to continue unabated with the purpose of making Plaintiff's working conditions intolerable in order to force her into a constructive discharge. Since she did not resign, Defendant fired her.

5.66    The **CIFS'** decision to discharge **Casta** was unlawful and unjustified; and it constituted an act of discrimination and retaliation against Plaintiff for having complained of hostile work environment, exercised her legally protected benefits under the SIF's program and requested leave under the FMLA.

5.67    The hostile work environment, the retaliatory acts and unlawful discharge caused Plaintiff to suffer severe mental anguish and distress, as well as loss wages, for which Defendant is accountable and liable to Plaintiff.

## VI.  FIRST CAUSE OF ACTION

6.1     Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

6.2     This First Cause of Action arises under Act 17, Act 100 and Act 69.

6.3     **CIFS** discriminated against **Casta** with respect to her terms, conditions and privileges of employment because of her sex, in violation of Act 17, Act 100 and Act 69.

6.4     As a direct result of **CIFS'** unlawful employment practices, **Casta** suffered, is suffering and will continue to suffer severe mental, psychological, moral and emotional pain, anguish and distress; and she has sustained a loss of happiness, to a loss of the capacity enjoy life, a loss of the capacity enjoy and professional endeavors, and an impairment of the capacity to perform activities common to a woman of her age. Plaintiff is entitled to receive a just and fair compensation for these damages.

6.5     As a consequence of **CIFS'** unlawful employment practices and the resultant mental damages suffered by **Casta**, she has incurred and will continue to incur in the future in expenses for psychiatric treatment and medications. Plaintiff is entitled to receive a reimbursement from Defendant for these medical expenses.

6.6     **Casta** is entitled to receive a full, just and fair compensation for the foregoing mental damages and medical expenses and which, pursuant to Act 17, Act 100 and Act 69, consist in the twofold amounts of the actual damages suffered by her.

6.7     Pursuant to Act 17, Rule 44 of the Puerto Rico Rules of Civil Procedure, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, Plaintiff is entitled to an award for the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE, Casta** demands that Judgment be entered in her favor and against **CIFS**: awarding her the amount of THREE MILLION DOLLARS ($3,000,000.00) for mental damages; reimbursing her past and future medical expenses, reasonably estimated at this time

22

in the amount of ONE HUNDRED SIXTEEN THOUSAND SEVEN HUNDRED DOLLARS ($116,700.00); doubling the foregoing amounts for a total of **SIX MILLIONS TWO HUNDRED THIRTY-THREE THOUSAND FOUR HUNDRED DOLLARS ($6,233,400.00);** awarding her a reasonable amount for attorneys' fees, the costs of this action and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## VII.  SECOND CAUSE OF ACTION

7.1    Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

7.2    This Second Cause of Action arises under Act 17, Act 100 and Act 69.

7.3    **CIFS** discharged **Casta** from her employment in retaliation for having complained of same sex sexual harassment, in violation of in violation of Act 17, Act 100 and Act 69.

7.4    As a direct result of **CIFS'** unlawful employment practices, **Casta** suffered, is suffering and will continue to suffer severe mental, psychological, moral and emotional pain, anguish and distress; and she has sustained a loss of happiness, to a loss of the capacity enjoy life, a loss of the capacity enjoy and professional endeavors, and an impairment of the capacity to perform activities common to a woman of her age. Plaintiff is entitled to receive a just and fair compensation for these damages.

7.5    As a consequence of **CIFS'** unlawful employment practices and the resultant mental damages suffered by **Casta**, she has incurred and will continue to incur in the future in expenses for psychiatric treatment and medications. Plaintiff is entitled to receive a reimbursement from Defendant for these medical expenses.

7.6    As a direct result of **Casta's** unlawful discharge from her employment by **CIFS**, she has sustained a loss of earnings and employment benefits, which are reasonably

23

estimated in the amount of $78,500.00. Defendant is liable to Plaintiff for this loss of back pay and benefits.

7.7    **Casta** is entitled to receive a full, just and fair compensation for the foregoing mental damages, medical expenses and loss of earnings and which, pursuant to Act 17, Act 100 and Act 69, consist in the twofold amounts of the actual damages suffered by her.

7.8    Pursuant to Act 17, Rule 44 of the Puerto Rico Rules of Civil Procedure, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, Plaintiff is entitled to an award for the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE, Casta** demands that Judgment be entered in her favor and against **CIFS**: awarding her the amount of THREE MILLION DOLLARS ($3,000,000.00) for mental damages; granting her an award for back pay and loss of employment benefits, reasonably estimated in the amount of SEVENTY EIGHT THOUSAND FIVE HUNDRED DOLLARS ($78,500.00); reimbursing her past and future medical expenses, reasonably estimated at this time in the amount of ONE HUNDRED SIXTEEN THOUSAND SEVEN HUNDRED DOLLARS ($116,700.00); doubling the foregoing amounts for a total of **SIX MILLIONS THREE HUNDRED NINETY THOUSAND FOUR HUNDRED DOLLARS ($6,390,400.00);** awarding her a reasonable amount for attorneys' fees, the costs of this action and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## VIII.  THIRD CAUSE OF ACTION

8.1    Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

8.2    This Third Cause of Action arises under Articles 1802 and 1803.

8.3    **CIFS,** through its agents and employees, caused **Jelú** to be subjected to sexual harassment, assault, battery, intimidation, threats, breach of the peace, undue intrusions into

24

her private life, and attacks to her professional reputation, in violation of her constitutional right to privacy and dignity, as well as to other extreme and outrageous conduct, with the intent to cause, or reckless disregard of the probability of causing, Plaintiff to suffer emotional distress.

8.4 As a direct result of **CIFS'** tortuous behavior, **Casta** suffered, is suffering and will continue to suffer severe mental, psychological, moral and emotional pain, anguish and distress; and she has sustained a loss of happiness, to a loss of the capacity enjoy life, a loss of the capacity enjoy and professional endeavors, and an impairment of the capacity to perform activities common to a woman of her age. Plaintiff is entitled to receive a just and fair compensation for these damages.

8.5 As a consequence of **CIFS'** tortuous behavior and the resultant mental damages suffered by **Casta**, she has incurred and will continue to incur in the future in expenses for psychiatric treatment and medications. Plaintiff is entitled to receive a reimbursement from Defendant for these medical expenses.

8.6 Pursuant to Rule 44 of the Puerto Rico Rules of Civil Procedure, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, Plaintiff is entitled to an award for the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE, Casta** demands that Judgment be entered in her favor and against **CIFS**: awarding her the amount of **THREE MILLION DOLLARS ($3,000,000.00)** for mental damages; reimbursing her past and future medical expenses, reasonably estimated at this time in the amount of **ONE HUNDRED SIXTEEN THOUSAND SEVEN HUNDRED DOLLARS ($116,700.00)**; awarding her a reasonable amount for attorneys' fees, the costs of this action and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

25

## IX.  FOURTH  CAUSE OF ACTION

9.1     Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

9.2     This Fourth Cause of Action arises under Act 45.

9.3     **CIFS** failed to comply with its obligation to reinstate **Casta** in her job once the SIF released her from treatment and discharged her from her employment, in violation to Act 45.

9.4     As a direct result of **CIFS'** unlawful employment practices, **Casta** suffered, is suffering and will continue to suffer severe mental, psychological, moral and emotional pain, anguish and distress; and she has sustained a loss of happiness, to a loss of the capacity enjoy life, a loss of the capacity enjoy and professional endeavors, and an impairment of the capacity to perform activities common to a woman of her age. Plaintiff is entitled to receive a just and fair compensation for these damages.

9.5     As a consequence of **CIFS'** unlawful employment practices and the resultant mental damages suffered by **Casta**, she has incurred and will continue to incur in the future in expenses for psychiatric treatment and medications. Plaintiff is entitled to receive a reimbursement from Defendant for these medical expenses.

9.6     As a direct result of **Casta's** unlawful discharge from her employment by **CIFS**, she has sustained a loss of earnings and employment benefits, which are reasonably estimated in the amount of $78,500.00. Defendant is liable to Plaintiff for this loss of back pay and benefits.

9.7     Pursuant to Act 45, Rule 44 of the Puerto Rico Rules of Civil Procedure, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, Plaintiff is entitled to an award for the costs to be incurred in this suit, plus reasonable attorneys' fees.

26

**THEREFORE, Casta** demands that Judgment be entered in her favor and against **CIFS**: awarding her the amount of **THREE MILLION DOLLARS ($3,000,000.00)** for mental damages; granting her an award for back pay and loss of employment benefits, reasonably estimated in the amount of **SEVENTY EIGHT THOUSAND FIVE HUNDRED DOLLARS ($78,500.00)**; reimbursing her past and future medical expenses, reasonably estimated at this time in the amount of **ONE HUNDRED SIXTEEN THOUSAND SEVEN HUNDRED DOLLARS ($116,700.00)**; awarding her a reasonable amount for attorneys' fees, the costs of this action and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## X.  FIFTH CAUSE OF ACTION

10.1    Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

10.2    This Fifth Cause of Action arises under Act 115.

10.3    **CIFS** discharged **Casta** from her employment in retaliation for having sought statutory benefits from the SIF, in violation of in violation of Act 115.

10.4    As a direct result of **CIFS'** unlawful employment practices, **Casta** suffered, is suffering and will continue to suffer severe mental, psychological, moral and emotional pain, anguish and distress; and she has sustained a loss of happiness, to a loss of the capacity enjoy life, a loss of the capacity enjoy and professional endeavors, and an impairment of the capacity to perform activities common to a woman of her age. Plaintiff is entitled to receive a just and fair compensation for these damages.

10.5    As a consequence of **CIFS'** unlawful employment practices and the resultant mental damages suffered by **Casta**, she has incurred and will continue to incur in the future in expenses for psychiatric treatment and medications. Plaintiff is entitled to receive a reimbursement from Defendant for these medical expenses.

10.6   As a direct result of **Casta's** unlawful discharge from her employment by **CIFS**, she has sustained a loss of earnings and employment benefits, which are reasonably estimated in the amount of $78,500.00. Defendant is liable to Plaintiff for this loss of back pay and benefits.

10.7   **Casta** is entitled to receive a full, just and fair compensation for the foregoing mental damages, medical expenses and loss of earnings and which, pursuant to Act 115, Act 100 and Act 69, consist in the twofold amounts of the actual damages suffered by her.

10.8   Pursuant to Act 115, Rule 44 of the Puerto Rico Rules of Civil Procedure, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, Plaintiff is entitled to an award for the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE, Casta** demands that Judgment be entered in her favor and against **CIFS**: awarding her the amount of THREE MILLION DOLLARS ($3,000,000.00) for mental damages; granting her an award for back pay and loss of employment benefits, reasonably estimated in the amount of SEVENTY EIGHT THOUSAND FIVE HUNDRED DOLLARS ($78,500.00); reimbursing her past and future medical expenses, reasonably estimated at this time in the amount of ONE HUNDRED SIXTEEN THOUSAND SEVEN HUNDRED DOLLARS ($116,700.00); doubling the foregoing amounts for a total of **SIX MILLIONS ONE HUNDRED NIGHTY FIVE THOUSAND TWO HUNDRED DOLLARS ($6,195,200.00);** awarding her a reasonable amount for attorneys' fees, the costs of this action and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## XI.  SIXTH CAUSE OF ACTION

11.1   Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

11.2   This Sixth Cause of Action arises under Act 80.

11.3    **CIFS** discharged **Casta** from her employment without just cause, in violation of Act 80. Consequently, Plaintiff is entitled to receive from Defendant the salary and additional compensation provided by law.

11.4    Pursuant to 29 L.P.R.A. § 185k, Rule 44 of the Puerto Rico Rules of Civil Procedure, Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, Plaintiff is entitled to an award for the costs to be incurred in this suit, plus reasonable attorneys' fees.

**THEREFORE**, **Casta** demands that Judgment be entered in her favor and against **CIFS,** granting her statutory severance pay; awarding her a reasonable amount for attorney's fees, the costs of this action and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## XII.  SEVENTH CAUSE OF ACTION

12.1    Plaintiff repeats and reasserts by reference each and every allegation contained the preceding paragraphs and incorporates the same herein as though fully set forth.

12.2    This Seventh Cause of Action arises under the FMLA.

12.3    **CIFS** engaged in prohibited personnel practices by denying **Casta** medically authorized leave and/or interfering with the use of the leave, in violation of the FMLA.

12.4    **CIFS** engaged in prohibited personnel practices by terminated **Casta** in retaliation for having used benefits afforded and protected under the FMLA.

12.5    **Casta** is entitled to receive an award for back pay with interest for any time not allowed and/or not paid; and, an additional amount as liquidated damages, equal to the sum of the foregoing amount and interest.

12.6    **Casta** requests any additional remedy, equitable or compensatory, to which she me be entitled to be law or in equity.

**THEREFORE, Casta** demands that Judgment be entered in her favor and against **CIFS**: granting her an award for back pay with interest for any time not allowed and/or not paid; awarding her an additional amount as liquidated damages equal to the sum of such amount and interest; granting her equitable relief as may be appropriate; awarding her a reasonable amount for attorneys' fees, the costs of this action and post-judgment interests; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE,** it is respectfully requested that Judgment be entered by this Honorable Court in favor of **Casta** and against **CIFS**:

a.  granting Plaintiff all the sums and remedies requested in the complaint;

b.  imposing upon Defendant the payment of all costs and expenses to be incurred in this lawsuit;

c.  granting Plaintiff any other relief that she may be entitled to as a matter of law; and,

d.  awarding Plaintiff post-judgment interests, plus a reasonable amount for attorneys' fees.

**RESPECTFULLY SUBMITTED.** In San Juan, Puerto Rico, this 14th day of December, 2017.

*S/José F. Quetglas Jordán*
USDC-PR #203411

**QUETGLAS LAW FIRM, P.S.C.**
1353, Luis Vigoreaux Ave.
PMB 657
Guaynabo, PR 00966
Tel:(787) 406-8915
Email: jfquetglas@gmail.com;
quetglaslawpsc@gmail.com

*S/Pedro R. Vazquez III*
USDC-PR NO. 216311

405 Esmeralda Ave.
Suite 2, PMB 153
Guaynabo, PR   00969-4457
(787) 925-4669
Email: prvazquez3@gmail.com

*S/Pedro R. Vazquez III*

31